Ken Lorance was convicted of two counts of murder, a violation of § 13A-6-2, Ala. Code 1975. The trial court sentenced Lorance to life imprisonment and ordered him to pay court costs, attorney's fees, and $100 to the victims compensation fund. On appeal, Lorance argues: (1) that the trial court erred by denying his motion for a judgment of acquittal because, he says, there was a fatal variance between the offenses alleged in the indictment and the evidence presented at trial; (2) that his earlier conviction for kidnapping arising from the same incident against the same person precludes his conviction for murder because, he says, the latter conviction violated his double jeopardy rights; (3) that the evidence was insufficient to establish that he had an intent to kill, and (4) that double jeopardy prohibits him from being *Page 646 
convicted of two counts of murder for the killing of one victim.
 Facts
On the evening of June 3, 1992, Ken Lorance telephoned Franklin Joe Bates; he asked Bates if he would go with him to see Roy Woodward. Lorance believed that Woodward had stolen some money from his uncle. Bates agreed. When Lorance arrived to pick Bates up, Woodward was already in the truck with Lorance. After Bates got into Lorance's truck, Lorance threatened Woodward and told him that he better return the stolen money. (R. 287.) Woodward suggested to Lorance that Randy McNutt might have taken the money. The three men drove to McNutt's house. Woodward testified that while they were driving to McNutt's trailer, Lorance ordered him to "whip up on" McNutt so he would disclose what he did with the money. The three men walked inside McNutt's trailer and took him into the back room. Then, Lorance forced McNutt's father into the living room at gunpoint. Lorance told him to sit down and if he got up, "he would be a dead man." (R. 199.) Lorance returned to the back room. Woodward slapped and kicked McNutt, attempting to force McNutt to tell him where the money was located. Then Woodward told Lorance that he did not know what else to do to McNutt. Woodward and Bates dragged him out of the trailer, while Lorance stood nearby holding a gun. (R. 200.) When they forced McNutt into Lorance's truck, McNutt said, "What's going on man?" Lorance responded, "You know what the f___ is going on." (R. 212.) McNutt was severely intoxicated.
The men went to a barn on Lorance's property. They took McNutt inside the barn; Lorance handcuffed him to a pole. Then, "Lorance took two ropes to spread his legs out and tied them up" so he was suspended in the air. Woodward testified that Lorance pulled McNutt off the ground and "pulled up each leg on each side and tied it up." (R. 214.) While McNutt was tied up, Lorance beat him, telling McNutt that he better tell him where the money is or he would kill him. (R. 292-93.)
After approximately 20 to 25 minutes, the three men went to Woodward's house, leaving McNutt suspended in the air. (R. 218.) Earlier in the day, McNutt was at Woodward's house drinking with Woodward's wife; therefore, Lorance ordered Woodward to ask his wife if she knew anything about the missing money. When they arrived, Woodward went inside, asked his wife where the money was, and then pushed her up against a wall. When she responded that she did not know anything about the money, Woodward said, "`Kenneth has got Randy hung up at the barn, and he is going to kill him.'" (R. 172, 217-18.) Then, Woodward left.
The men returned to the barn and Lorance began hitting McNutt again. About 15 or 20 minutes later, Lorance untied and unhandcuffed McNutt. Lorance and Woodward went to Lorance's basement, while Bates stayed with McNutt so he could clean himself up. After McNutt had cleaned up, Bates took him to the basement.
After McNutt was in the basement, Lorance made him eat two hot dogs and drink a cup of coffee. When McNutt finished eating, Lorance placed a folding chair next to a pole, told McNutt to sit down, and handcuffed him to the pole with his hands behind his back. (R. 223, 227, 299.) Lorance hit McNutt's head against the pole a few times. (R. 229, 302.) Lorance was cussing at McNutt and said, "You're going to tell me where the goddamn money is at." (R. 229.) Then, Lorance "skinned the end of an extension cord with his pocket knife" and was shocking McNutt with the wires saying, "You'll tell me where the money's at." (R. 304.) Lorance began shocking McNutt on his fingers. McNutt then told Lorance that the money was in the trunk of a vehicle. (R. 230.) After McNutt told Lorance where the money was located, Lorance "snapped at that point." (R. 305.) He went into a rage and *Page 647 
continuously shocked McNutt, yelling, "`You no-count rascal.'" (R. 309.) At one point, Lorance taped the wires to McNutt's chest and repeatedly plugged the extension cord in and out of the socket. Then, Lorance put the wires in McNutt's nostrils and poured a pitcher of water over his head. McNutt immediately "went limp and fell over." (R. 230, 310-11.) Lorance took the handcuffs off and pushed down on McNutt's chest a few times. Bates then tried unsuccessfully to resuscitate McNutt; he told Lorance that he had killed McNutt. (R. 337.) Lorance responded "that's what the son of a bitch needed." (R. 231.)
Lorance, Woodward, and Bates placed McNutt's body in Lorance's truck and drove to Parkway Medical Center, where Lorance's girlfriend was working the night shift. His girlfriend came outside, checked McNutt with a stethoscope, shook her head, and said he was dead. Lorance said, "`[d]on't worry, I'll take care of it.'" (R. 236, 315.)
The three then drove to Woodward's house to get his truck. Following Lorance's orders, Woodward and Bates moved McNutt's body from Lorance's truck to Woodward's truck. Bates drove Woodward's truck to Six Mile Road while Lorance and Woodward followed him in Lorance's truck. Bates slowly drove the truck into a ditch. Then, he got into Lorance's truck. Lorance threatened to kill Woodward and Bates if they told anyone about the incident. (R. 318.)
On direct examination, Joseph Embry, the state medical examiner, testified that McNutt had bruises and abrasions on his hands and face. He also had a bruise on his upper chest, which extended over his left collar bone and a bruise with an abrasion in the center of his chest. McNutt's right leg had small bruises and scrapes. Embry testified that his other injuries consisted of bruises, scrapes, and abrasions, which were on his arms, hands, and back. (R. 151-52.) Embry further testified that McNutt's internal injuries were more traumatic than his external injuries. (R. 154.) McNutt had two large areas of bleeding under his scalp and a slight injury to the base of his brain. Embry explained that McNutt had a very high blood-alcohol level and that a head injury in association with a high blood-alcohol level can cause death. Embry attributed McNutt's cause of death to "blunt-force trauma in the head, in association with acute ethanol or drinking alcohol intoxication." (R. 155.) He testified that although the blunt-force trauma would not have killed McNutt in and of itself, the head trauma combined with the high blood-alcohol level would be enough to cause death. On cross-examination, Embry also acknowledged that the electrical shocks "probably" killed McNutt.[1] (R. 163.)
 I.
Lorance argues that the trial court erred by denying his motion for a judgment of acquittal because, he says, there was a fatal variance between the offenses alleged in the indictment and the evidence presented at trial. Count one of the indictment alleged that Lorance intentionally caused McNutt's death by beating him with fists or with a blunt instrument. Count two of the indictment alleged that Lorance intentionally caused the death of McNutt by striking his head against a pole. The jury returned a verdict finding him guilty as to both counts in the indictment. Lorance contends that the evidence at trial showed that McNutt died as the result of electrocution, not solely as the result of being beaten by fists or striking his head against a pole while severely intoxicated.
We find no variance between the indictment and the evidence presented at trial. *Page 648 
Lorance's argument actually goes to the sufficiency of the evidence, i.e., whether McNutt died from a beating by fists, by blunt-force trauma to the head when his head struck the pole, or from electrocution. See Springfield v. State, 580 So.2d 88 (Ala.Cr.App. 1991).
Joseph Embry, the state medical examiner, testified on direct examination that McNutt died as the result of blunt-force trauma to the head combined with severe alcohol intoxication. On cross-examination, he testified that he believed the electrical shocks probably killed McNutt. (R. 163.) The autopsy report concluded that McNutt died as the result of blunt-force trauma to the head in association with acute ethanol intoxication. (R. 167.) Based on this evidence, we find that a reasonable jury could have found that McNutt died as a result of blunt-force trauma to the head in association with acute ethanol intoxication. We will not substitute our judgment for that of the jury. Cumbo v. State,368 So.2d 871 (Ala.Cr.App. 1978).
 II.
Lorance also argues that his prior conviction for kidnapping precludes his conviction for murder of the same victim because, he says, a subsequent conviction for murder would subject him to double jeopardy. He contends that the Double Jeopardy Clause was violated because his convictions for kidnapping and murder arose out of the same facts and circumstances.
Double jeopardy prohibits a person from being punished twice for the same offense.
 "The Fifth Amendment to the United States Constitution and Section 9 of the Alabama Constitution provide that no person can twice be placed in jeopardy for the same offense. The double jeopardy provisions confer three separate guarantees: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense."
Ex parte Wright, 477 So.2d 492, 493 (Ala. 1985), citing North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076,23 L.Ed.2d 656 (1969); see Ex parte Howard, 710 So.2d 460 (Ala. 1997). "A single transaction may violate more than one criminal statute. The test for determining whether a single transaction is one offense or two distinct offenses for double jeopardy purposes is whether each offense requires proof of a statutory element that the other does not." Robertson v. State, 680 So.2d 931, 932
(Ala.Cr.App. 1994), rev'd on other grounds, 680 So.2d 933 (Ala.), on remand, 680 So.2d 934 (Ala.Cr.App. 1996); see also United States v. Dixon, 509 U.S. 688 (1993); Poole v. State,650 So.2d 541 (Ala.Cr.App. 1994).
A person is guilty of murder, under § 13A-6-2, Ala. Code 1975, if that person "[w]ith intent to cause the death of another person . . . causes the death of that person or another person." A person commits the crime of kidnapping in the first degree if that person "abducts another person with intent to . . . inflict physical injury upon him, or to violate or abuse him sexually." § 13A-6-43, Ala. Code 1975.
Murder and kidnapping in the first degree are separate and distinct offenses, each requiring proof of different elements. Therefore, the two separate convictions for kidnapping in the first degree and for murder do not constitute double jeopardy. See Robertson.
 III.
Lorance further argues that the trial court erred by denying his motion for a judgment of acquittal because, he says, the State failed to prove a prima facie case. Specifically, he argues that the State failed to prove that he specifically intended to kill McNutt. We disagree. *Page 649 
In reviewing a trial court's denial of a motion for a judgment of acquittal, we must determine "`whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty.'" Frasier v. State, 766 So.2d 181, 183
(Ala.Cr.App. 1998), quoting Burell v. State, 680 So.2d 975,978 (Ala.Cr.App. 1996). This court must determine whether the legal evidence before the jury was such that the jury could have found Lorance guilty beyond a reasonable doubt of murder. See id. We must view the evidence in a light most favorable to the State, allowing all legitimate inferences therefrom. See Faircloth v. State, 471 So.2d 485
(Ala.Cr.App. 1984).
To prove a prima facie case of murder under § 13A-6-2, Ala. Code 1975, the State must prove that "with intent to cause the death of another person, [the accused] cause[d] the death of that person or of another person." The question whether Lorance intentionally caused the death of McNutt was a question for the jury. Garrison v. State, 521 So.2d 997, 1005 (Ala.Cr.App. 1986) ("conflicting evidence as to intent presents a question for the jury"). Although Lorance asserts that he did not intend to kill McNutt, that his intent was only to locate the money, intent to kill may be "inferred from the use of a deadly weapon or other attendant circumstances." Id. at 1005. "`Because the element of intent, being state of mind or mental purpose, is usually incapable of direct proof, it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.'" Benton v. State, 536 So.2d 162, 164
(Ala.Cr.App. 1988), quoting Johnson v. State, 390 So.2d 1160,1167 (Ala.Cr.App. 1980).
In this case, there was ample evidence presented by the State from which a jury could have reasonably inferred that Lorance acted intentionally. There was sufficient evidence to establish a prima facie case of murder. Therefore, the trial court did not err in submitting the case to the jury. See Garrison.
 IV.
Lorance next argues that his conviction on two counts of murder violated his right under the Fifth Amendment not to be twice placed in jeopardy for the same offense. The State conceded in its appellate brief that the two convictions for the same murder constituted multiple convictions for a single offense, and it agreed that this cause must be remanded for the trial court to set aside one of the convictions.
Count one of the indictment alleged that Lorance intentionally caused the death of McNutt by beating him with his fists or with a blunt instrument. Count two of the indictment alleged that Lorance intentionally caused the death of McNutt by striking his head against a pole. (C. 16.) The jury returned a verdict finding him guilty as to both counts. (R. 390.) Subsequently, the trial court adjudged Lorance guilty as to both counts of the indictment. (R. 392.) At the sentencing hearing, the trial court sentenced him to one life sentence, which is to be served concurrently with his previous conviction for kidnapping, which arose out of the same incident. (R. 400.)
Although Lorance failed to address this issue at trial or in his motion for a new trial, this issue is preserved for appellate review because it raises a jurisdictional issue. The trial court was without jurisdiction to find him guilty of two counts of murder of one victim. See Rolling v. State, 673 So.2d 812
(Ala.Cr.App. 1995).
Double jeopardy prohibits a person from being punished twice for the same offense. See Ex parte Wright, 477 So.2d 492, 493
(Ala. 1985); Ex parte Rice, 766 So.2d 143 (Ala. 1999). In Ex parte Rice, the Alabama Supreme Court wrote:
 "The language used by the Alabama Legislature in § 13A-6-2(a)(3) is clear and unambiguous. Section 13A-6-2(a)(3) *Page 650 
defines one criminal offense — murder. A `murder,' within the definition of § 13A-6-2(a)(3), may be committed by several different methods, and the State may allege and prove any one or all of those various methods in its attempt to establish the defendant's guilt. This court held in Sisson v. State, 528 So.2d 1159 (Ala. 1988), that when a statute provides alternative or different methods of committing the same offense, each alternative method is not to be treated as a separate offense. Because we are dealing here with a single statute (§ 13A-6-2(a)(3)) that defines a single offense, the Blockburger test is not applicable. See e.g., Sanabria v. United States, 437 U.S. 54, 70, n. 24, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (`Because only a single violation of a single statute is at issue here, we do not analyze this case under the so-called "same evidence" test, which is frequently used to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes')."
766 So.2d at 150-51.
Here, Lorance's conviction of two counts of murder arising from one incident involving one victim violates his constitutional right to be protected from double jeopardy, as explained by the Alabama Supreme Court in Ex parte Rice; therefore, we must remand this cause to the trial court. See Moore v. State,709 So.2d 1324 (Ala.Cr.App. 1997); Rolling v. State, 673 So.2d 812
(Ala.Cr.App. 1995).
Although Lorance was ordered to serve only one sentence, the presence of two felony convictions for murder could affect any later sentencing upon application of the Habitual Felony Offender Act should he commit a future offense. See Rolling v. State,673 So.2d 812 (Ala.Cr.App. 1995). Therefore, in accordance with the State's request and with Alabama caselaw, we remand this cause to the trial court with instructions that it elect between the two counts of murder in the indictment. The trial court should file its return to remand within 28 days of the date of this opinion.
REMANDED WITH DIRECTIONS.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.
[1] After he had completed his autopsy report, which showed the cause of death to be blunt-force trauma combined with severe alcohol intoxication, Embry was made aware that the victim had suffered electrical shocks. Although he acknowledged on cross-examination that these shocks "probably" killed McNutt, he never changed his official report.