PER CURIAM.
The appellant, Ryan Gerald Russell, was convicted of murdering 11-year-old Katherine Helen Gillespie, an offense defined as capital by § 13A-5-40(a)(15), Ala.Code 1975, because Katherine was under the age of 14.[1] The jury unanimously voted that Russell be sentenced to death after finding that the capital offense was especially heinous, atrocious, or cruel as compared to other capital murders, § 13A-5-49(8), Ala.Code 1975. The circuit court sentenced Russell to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-55, Ala.Code 1975.[2]
The State's evidence tended to show that on June 16, 2008, at around 9:00 p.m., Shelby County sheriff deputies were dispatched to Russell's house in response to a 911 emergency call. Deputies Melvin Janisek, Jay Fondren, and Paul George entered the home through an entry door near the garage. Deputy Janisek and Deputy Fondren proceeded upstairs, and Deputy George checked the vehicles in the garage. One of the vehicles, a Cadillac Escalade sport-utility vehicle, had been involved in an vehicular accident earlier that day. Deputy George testified that he discovered Katherine's body in the backseat of the Escalade, that her body had been partially stuffed into a garbage can, that her body was visible only from the waist down, and that she was covered in bloody towels and clothes. (R. 1155.) The State's medical examiner, Dr. Adel Shaker, testified that Katherine died as a result of a gunshot wound to her head, that the wound was a "contact wound," meaning that there was no distance between the gun and her head when the fatal shot had been fired, and that the bullet caused Katherine's skull to "blow[ ] up." (R. 1444-46.)
Police searched the house and discovered Russell lying in a fetal position on the floor of the bathroom shower. The water was running, and Russell was wearing only a pair of black shorts. (R. 1133.) "[L]ittle oblong pills [were lying] on the ground in the shower with [Russell]." (R. 1133.) The washing machine, near the Escalade, was filled with bloody water. There were "a number of clothes and cell phones" in the water and a .40-caliber shell casing. This casing was later determined to have been fired from a .40-caliber Glock brand semi-automatic pistol belonging to Russell. This weapon was discovered on the garage floor under a sofa several weeks after the shooting when Russell's family was cleaning the house.
Andrew Stone testified that around 6:00 p.m. on June 16, 2008, he, Robert "Bo" Montiel, and Andrew's 14-year-old sister, Mallie Stone, were traveling in a truck on Inverness Parkway. Andrew slowed his vehicle to allow an oncoming car to pass his truck, and his truck was hit from behind by a Cadillac Escalade. (R. 995.) After the collision, the Escalade sped off *408 and the boys followed the car to Russell's address-5048 Carrie Downs Road. Stone and Montiel got out of their vehicle and approached the driver's side of the Escalade. Montiel testified that the back door of the Escalade opened, that Katherine got out of the car, that she was crying, and that Katherine begged them: " 'Please don't call the police on my daddy. He didn't mean to do anything wrong.' " (R. 999.) Stone told Katherine that police had to be called because it was a "hit and run" accident. (R. 1023.) Stone and Montiel tried to talk to Russell through the car window but Russell refused to say anything to them. Both Montiel and Stone testified that Russell showed no emotion.
While the boys attempted to speak with Russell, Katherine walked to the street and rolled a trash can down the driveway and placed it next to the house. Montiel stated that Katherine then entered a back door leading into the garage.[3] When Katherine went inside the garage, the garage door opened and Russell backed the Escalade into the garage and lowered the garage door.
Stone said that after the garage door closed, he telephoned his parents, and his parents arrived at Russell's residence within "seven or eight" minutes. (R. 1012.) His parents had telephoned the police en route to Russell's house and the police arrived at Russell's shortly after his parents. Police arrived at Russell's home at approximately 6:30 p.m. They knocked on Russell's door, but Russell would not answer. Ultimately, the police informed the Stones that because no one had been injured in the accident and no one would answer the door-there was nothing they could do at that time. After about 20 or 30 minutes, everybody left Russell's residence.
Emily Webber testified that she was Russell's former girlfriend and that she had lived with Russell on and off for years. She testified that Russell drank too much and that she left him in November 2006 but returned in July 2007 when she learned that Katherine was moving to Birmingham to live with Russell. Because of Russell's drinking, Webber said, she moved out again in January 2008. Webber also testified that Russell had inherited several guns from his father and that he kept them locked up in the basement.
Webber further testified that on June 16, 2008, at approximately 4:30 p.m. she received a telephone call from Susanna Russell, Russell's sister. Susanna told her that she had been trying to reach Russell all day to inform him that their grandfather was about to die and that she needed Russell "to take care of some family matters and to make arrangements for their grandfather" but that she had been unable to contact Russell. (R. 1049.) Because Susanna lived in Panama City, Florida, she asked Webber to go to Russell's house to inform him about their grandfather. Webber went to Russell's home, but no one answered the door.
At approximately 8:00 p.m. that same evening, Webber spoke with Carlyn Russell, Russell's stepmother. Carlyn told her that Russell's grandfather had died, and she asked Webber to go to Russell's house and inform him of his grandfather's death. At around 8:30 p.m. Webber and a friend, Nick Barnes, returned to Russell's house. Webber said that as she walked down the driveway, she saw "flickering from a television in the master bedroom." (R. 1100.) She looked through a window on the garage *409 door and she saw "the shadow of a person with [Russell's] stature in between [two] vehicles" parked inside the garage. (R. 1054.) Webber began beating on the garage door but was unable to get Russell to respond. Webber informed Carlyn, and Carlyn asked Webber to try to get into the house. Webber testified that she entered the house through an unlocked door near the garage, that she looked inside the Escalade and saw that the two front air bags had deployed, and that she became very concerned for Katherine's safety. (R. 1063.) Webber left the house, and she and Barnes telephoned emergency 911 which ultimately lead to the discovery of Katherine's body inside the Escalade.
Experts testified that when the fatal shot was fired the gun was in direct contact with the right side of Katherine's head causing a "stellate, or star shaped, entrance wound." The bullet caused "extensive intracerebral hemorrhages and subarachnoid hemorrhages" by "pulverizing and contusing the whole right and left side hemisphere of the brain and the brain stem fracturing the cranial cavity completely, the vault of the cranial cavity and the base of the skull." (R. 1445.) Katherine died instantly. Fragments of the bullet removed from Katherine were "consistent with a .40 caliber class bullet jacket." (R. 1375-76.)
A blood-splatter expert, Angelo Della Manna, testified that based on his examination of the crime scene it was his opinion that Katherine had been shot in the laundry room while she was "crouching" in a 12-inch-wide space between the clothes dryer and a wall.[4] Using a doll approximating Katherine's size and height, Della Manna showed the jury the position Katherine was in when she was shot. Della Manna further testified that, based on the configuration of bloodstains in the laundry room, at the time of the shooting Katherine's head had been between 18 and 36 inches above the floor. At a height of 36 inches from the floor, Katherine's head would have been lower than the top of the dryer.
The jury convicted Russell of capital murder. A separate sentencing hearing was held. The jury unanimously recommended that Russell be sentenced to death. The circuit court followed the jury's recommendation.
Standard of Review
Because Russell has been sentenced to death, this Court must search the record of the trial-court proceedings for plain error. See Rule 45A, Ala. R.App. P. Rule 45A provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In discussing the scope of the plain-error standard of review, the Alabama Supreme Court has stated:
" ' "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." ' Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) ). In *410 United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
" 'The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," United States v. Frady, 456 U.S. 152, 163 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S., at 163, n. 14.'
"See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would 'seriously affect the fairness or integrity of the judicial proceedings,' and that the plain-error doctrine is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result' (internal quotation marks omitted))."
Ex parte Brown, 11 So.3d 933, 938 (Ala.2008).[5]
Guilt-Phase Issues
I.
Russell argues that the circuit court erred in allowing the chief investigator, Shelby O'Connor, to be excused from the operation of "the Rule," which provides that witnesses shall not be present in the courtroom for the testimony of other witnesses, so that he could be present in the courtroom for the testimony of the other witnesses.[6]
The record shows that the following occurred immediately before the first witness testified:
"The Court: All right. We are about ready to call our first witness. Does either party wish to invoke the Rule?
"[Defense counsel]: We do, Your Honor.
"The Court: The Rule will be invoked so for the State-of course, [Russell] will always be present. For the State with the exception being your chief investigator-
"[Prosecutor]: Shelby O'Connor.
"The Court: Shelby O'Connor. All right."
(R. 888.) Russell did not object to O'Connor's being excluded from the Rule; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Rule 615, Ala. R. Evid., provides:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, *411 or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim's guardian, or the victim's family."[7]
"Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of a trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial." Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.1991).
The circuit court did not abuse its discretion in not invoking the Rule and allowing the chief investigator to remain in the courtroom. Russell is due no relief on this claim.
II.
Russell argues that the circuit court erred in allowing the jurors to be "death qualified" because, he says, doing so resulted in a conviction-prone jury.[8]
There was no objection to the prospective jurors being "death qualified"; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
"A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)."
Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995).
The circuit court did not error in allowing the jurors to be questioned about their views toward the death penalty. Russell is due no relief on this claim.
III.
Russell next argues that the State violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using its peremptory strikes to remove black prospective jurors from the venire solely on the basis of their race.
The United States Supreme Court in Batson held that it was a violation of the Equal Protection Clause of the United States Constitution for a State prosecutor to remove a black prospective juror from a black defendant's jury solely based on their race. This holding was extended to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ; to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) ; and to gender-based strikes in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Alabama Supreme Court in White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993), extended this protection to white prospective jurors.
Russell did not make a Batson objection after the jury was struck; therefore, we *412 review this issue only for plain error. See Rule 45A, Ala. R.App. P.
Here, the record reflects that, after jurors were removed for cause, 66 jurors remained in the venire. The State and the defendant both had 27 strikes, the last 2 of which were alternate jurors.[9] The State used 5 of its 27 peremptory strikes to remove all but one black prospective juror from the venire.
" 'To find plain error in the context of a Batson... violation, the record must supply an inference that the prosecutor was "engaged in the practice of purposeful discrimination." ' Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987) ). See also Saunders v. State, 10 So.3d 53, 78 (Ala.Crim.App.2007) ('For an appellate court to find plain error in the Batson [or J.E.B. ] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges.')."
Kelley v. State, 246 So.3d 1032, 1053 (Ala.Crim.App.2014).
"In many cases the appellate courts in this state have refused to find plain error grounded on Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when no prima facie showing of discrimination appears on the face of the record. Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) ; Jenkins v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993) ; Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)."
Dobyne v. State, 672 So.2d 1319, 1327 (Ala.Crim.App.1994).
"With respect to the first step of the process-the step at issue here-'[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.' Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala.1987) ). 'A defendant makes out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" surrounding a prosecutor's conduct during the defendant's trial.' Lewis v. State, 24 So.3d 480, 489 (Ala.Crim.App.2006) (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712 ), aff'd, 24 So.3d 540 (Ala.2009). 'In determining whether there is a prima facie case, the court is to consider "all relevant circumstances" which could lead to an inference of discrimination.' Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, 106 S.Ct. 1712, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of 'relevant circumstances' to consider in determining whether a prima facie case of race discrimination has been established:
" 'The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
" '1. Evidence that the "jurors in question share[d] only this one characteristic-their membership in the group-and that in all other respects *413 they [were] as heterogeneous as the community as a whole." [ People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance "it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions," Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
" '2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson [v. Kentucky ], 476 U.S. [79] 97, 106 S.Ct. [1712] 1723 [ (1986) ].
" '3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain[ v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
" '4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723 ; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
" '5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987) ; People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986) ; People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
" '6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
" '7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
" '8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721 ; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049 [ (1976) ].
" '9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra.'
"[ 526 So.2d at 622-23.]"
Kelley v. State, 246 So.3d at 1053-55.
We have reviewed the voir dire examination of the prospective jurors, which consists of over 700 pages of the record and the 14-page juror questionnaires. After reviewing the questionnaires and the extensive voir dire examination, we can easily discern why the State struck prospective jurors C.P., C.A., A.H., K.L., and E.B. Juror C.P. indicated that she had a nephew who had been prosecuted in the same county for murder; prospective juror A.H. stated during voir dire that he had been arrested and prosecuted but acquitted by a jury of the offense of animal cruelty; prospective juror C.A. stated that he was a full-time college student and had a job that paid an hourly wage and that he did not wish to serve as a juror; prospective juror E.B. stated that he was neutral *414 toward the death penalty and that he was not sure if the State should be allowed to impose the death penalty; and prospective juror K.L. said that she was in the medical field and was a member of the American Society of Clinical Pathologists.
All the above reasons are race-neutral reasons for removing a prospective juror. "[S]trikes based on previous criminal charges, prosecution, or convictions of the veniremember or a family member of the veniremember are not racially discriminatory...." Thomas v. State, 611 So.2d 416, 418 (Ala.Crim.App.1992). "A juror's indication that he or she does not wish to serve is a valid race-neutral reason." Gobble v. State, 104 So.3d 920, 949 (Ala.Crim.App.2010). "[M]ixed views on or reservations concerning the death penalty are a race-neutral reason for a strike of a prospective juror." Woolf v. State, 220 So.3d 338, 366 (Ala.Crim.App.2014). "Occupation is a permissible reason to defend against a Batson challenge...." Hall v. Luebbers, 341 F.3d 706, 713 (8th Cir.2003).
The record fails to raise an inference of discrimination in the jury-selection process; therefore, we find no plain error in regard to this Batson claim. Russell is due no relief on this claim.
IV.
Russell next argues that the circuit court erred in allowing to be admitted all the evidence seized as a result of a warrantless search of his house. There was no objection to the introduction of any evidence secured as a result of the search of Russell's house; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The State asserts that the police were validly in Russell's home to perform a welfare check on its occupants and that the items seized from the house were lawfully admitted into evidence.
As stated above, police entered Russell's house after receiving a 911 emergency call from Webber and Barnes. Before calling 911, Webber had entered the garage and had noticed that the air bags on Russell's Cadillac Escalade had deployed. Russell's family had tried to reach him for hours. Police had been to the residence earlier that day after the Escalade had been in an accident, and they had been unable to get the occupants to answer the door. Webber had twice been to Russell's residence that day and could get no one in the house to acknowledge her presence. Webber testified that she and Barnes called emergency 911 because she was concerned for Katherine's safety.
"[O]fficers may conduct a warrantless search if they believe that their lives or the lives of others are at risk." A.A.G. v. State, 668 So.2d 122, 128 (Ala.Crim.App.1995).
"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' [ Mincey v. Arizona, 437 U.S. 385] at 392 [ (1978) ] (quoting Wayne v. United States, 318 F.2d 205, 212 (C.A.D.C.1963) (Burger, J.)); see also [ Michigan v.] Tyler, [436 U.S. 499] at 509 [ (1978) ]. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. Mincey, supra, at 392; see also Georgia v. Randolph, [547 U.S. 103] at 118 [ (2006) ] ('[I]t would be silly to suggest *415 that the police would commit a tort by entering ... to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur')."
Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The United States Supreme Court has referred to this as the "emergency aid exception" to the warrant requirement. See Michigan v. Fisher, 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009).
The United States Court of Appeals for the Eleventh Circuit has stated:
"Following the reasoning of the Supreme Court, numerous federal and state courts have upheld warrantless emergency entries and searches based on endangerment to life. See, e.g., United States v. Hughes, 993 F.2d 1313 (7th Cir.1993) (report of woman and child in danger in crack house); United States v. Gillenwaters, 890 F.2d 679 (4th Cir.1989) (stabbing victim); United States v. Martin, 781 F.2d 671 (9th Cir.1985) (explosion in apartment); Mann v. Cannon, 731 F.2d 54 (1st Cir.1984) (open access to controlled substances by children); United States v. Riccio, 726 F.2d 638 (10th Cir.1984) (medical aid to defendant shot by police); United States v. Jones, 635 F.2d 1357 (8th Cir.1980) (report of gunshots); United States v. Barone, 330 F.2d 543 (2d Cir.1964) (screams in the night); United States v. Searle, 974 F.Supp. 1433 (M.D.Fla.1997) (report of gunshots); United States v. Herndon, 390 F.Supp. 1017 (S.D.Fla.1975) (report of gunshots); United States v. Hogue, 283 F.Supp. 846 (N.D.Ga.1968) (report of dead body); Johnson v. State, 386 So.2d 302 (Fla.App.1980) (report of dead body); State v. Carlson, 548 N.W.2d 138 (Iowa 1996) (missing person); State v. Butler, 676 S.W.2d 809 (Mo.1984) (en banc) (gunshot victim); State v. Mackins, 47 N.C.App. 168, 266 S.E.2d 694 (1980) (gunshots); State v. Max, 263 N.W.2d 685 (S.D.1978) (gunshots).
"Although this Court has not directly addressed emergency searches based on endangerment to life, we have on at least two occasions generally endorsed the validity of such searches. See United States v. Brand, 556 F.2d 1312 (5th Cir.1977) (noting defendant's concession that police officer who assisted ambulance attendants with medical emergency legally entered home); United States v. Green, 474 F.2d 1385 (5th Cir.1973) (indicating deputy fire marshal could validly search apartment to determine cause of fire where ascertaining cause was necessary to assure fire was completely extinguished). Furthermore, upholding warrantless searches in such situations is consistent with our jurisprudence concerning the exigent circumstances exception.
"Based on the foregoing, we conclude emergency situations involving endangerment to life fall squarely within the exigent circumstances exception. It is difficult to imagine a scenario in which immediate police action is more justified than when a human life hangs in the balance. Although the Fourth Amendment protects the sanctity of the home, its proscription against warrantless searches must give way to the sanctity of human life. When the police reasonably believe an emergency exists which calls for an immediate response to protect citizens from imminent danger, their actions are no less constitutional merely because the exigency arises on the wooden doorsteps of a home rather than marble stairs of a public forum."
United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir.2002).
*416 The Alabama Supreme Court has recognized this exception to the warrant requirement.
"The United States Supreme Court has held that ' "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' Mincey v. Arizona, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C.Cir.1963) ). For example, law-enforcement officers can enter a residence without a warrant to render emergency assistance to an injured person or to protect a person from immediate injury. Mincey, 437 U.S. at 392, 98 S.Ct. 2408. Moreover, the state of mind of the law-enforcement officer is immaterial 'as long as the circumstances, viewed objectively, justify [the officer's] action.' Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)."
State v. Clayton, 155 So.3d 290, 298 (Ala.2014).
In State v. Clayton, the Alabama Supreme Court adopted a three-pronged test when evaluating whether a warrantless entry of a home is lawful based on an officer's belief that an occupant's life is in danger.
"In United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir.2003), the United States Court of Appeals for the Tenth Circuit noted that it had, in an earlier decision, determined that the
" ' "basic aspects of the 'exigent circumstances' exception [with regard to the manufacturing of methamphetamine] are that (1) law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize the evidence, and (3) there must be some reasonable basis, approaching probable cause to associate an emergency with the area or place to be searched." '
"(Quoting United States v. Wicks, 995 F.2d 964, 970 (10th Cir.1993).) See also People v. Doll, 21 N.Y.3d 665, 998 N.E.2d 384, 975 N.Y.S.2d 721 (2013)."
155 So.3d at 301. " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), quoting Wayne v. United States, 115 U.S.App. D.C. 234, 241, 318 F.2d 205, 212 (1963). See also State v. Matthews, 665 N.W.2d 28, 34 (N.D.2003) ("A 911 call reporting an emergency can be enough to support a warrantless search under the exigent circumstances exception, particularly when the caller identifies himself or herself."); United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir.2006) ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention.").
Here, the three factors discussed in State v. Clayton were satisfied. Police had reasonable grounds to believe that the residents in Russell's house were in danger, police did not act with any motivation to arrest or seize any evidence, and police knew that Russell's vehicle had been involved in an accident earlier that day, that the vehicle's air bags had deployed, and that there was a good deal of damage to the vehicle. Here, the warrantless entry into Russell's house was lawful pursuant to the "emergency aid exception" to the warrant requirement. See State v. Clayton, supra. Therefore, all the evidence seized *417 from Russell's home was lawfully admitted. Russell is due no relief on this claim.
V.
Russell next argues that the circuit court erred when it allowed Dr. Adel Shaker, the medical examiner who performed Katherine's autopsy, to testify to the condition of Katherine's entire body at the time she performed the autopsy.
The record shows that Russell made a motion in limine seeking to exclude autopsy photographs of Katherine's genitalia because, he said, they implied that Katherine had been a victim of sexual abuse, an issue never argued at trial. The circuit court excluded the photographs but held that Dr. Shaker could testify concerning her complete physical findings from her autopsy.
Dr. Shaker testified that as part of her external examination of Katherine's body she documented the following injuries excluding the head injury : a contusion on Katherine's chest, a contusion on her left thigh, and two healed wounds, or scars, on Katherine's hymen. Dr. Shaker testified that the contusion on Katherine's chest would be consistent with a "blunt force trauma like an air bag" deploying and that the "red purple contusion" on Katherine's left thigh was "difficult to age." Dr. Shaker was asked no questions concerning the scars to Katherine's hymen.
"A trial court has wide discretion in determining whether to exclude or to admit evidence, and the trial court's determination on the admissibility of evidence will not be reversed in the absence of an abuse of that discretion." Woodward v. State, 123 So.3d 989, 1014 (Ala.Crim.App.2011). See also Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000) ; Barrett v. State, 918 So.2d 942, 946 (Ala.Crim.App.2005) ; Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000). We cannot say that the circuit court abused its discretion in admitting Dr. Shaker's testimony.
Moreover, Rule 45, Ala. R.App. P., provides:
"No judgment may be reversed or set aside ... on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
In explaining the application of Rule 45, Ala. R.App. P., this Court in Trimble v. State, 157 So.3d 1001, 1005 (Ala.Crim.App.2014), stated:
"In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court held that before a court's error in violating certain constitutional rights can be held harmless, the appellate court must be able to declare that the error was harmless beyond a reasonable doubt. In Ex parte Crymes, 630 So.2d 125 (Ala.1993), the Alabama Supreme Court explained:
" 'In determining whether the admission of improper testimony is reversible error, this Court has stated that the reviewing court must determine whether the "improper admission of the evidence ... might have adversely affected the defendant's right to a fair trial," and before the reviewing court can affirm a judgment based upon the "harmless error" rule, that court must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise *418 prejudice a substantial right of the defendant.'
" 630 So.2d at 126. See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (holding that the proper harmless-error inquiry asks, absent the improperly introduced evidence, 'is it clear beyond reasonable doubt that the jury would have returned a verdict of guilty')."
157 So.3d at 1005.
Dr. Shaker testified to her complete findings on the condition of Katherine's body but there was no further testimony concerning any scars to Katherine's hymen. This was an isolated reference. Thus, even if we were to conclude that the circuit court clearly abused its discretion in admitting Dr. Shaker's testimony, which we do not, any possible error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Russell is due no relief on this claim.
VI.
Russell next argues that the circuit court erred in allowing prior-bad-acts evidence to be admitted during the testimony of Emily Webber, Russell's former girlfriend, and, he says, the circuit court compounded that error by not giving any limiting instruction on the use of that evidence.[10]
The record shows that on direct examination Webber testified that Russell drank excessively and that she had left him because of his drinking but that she moved back in with him to help raise Katherine. She said that she only stayed for six months at that time and left again because of Russell's drinking. On cross-examination, the following occurred:
"[Defense counsel]: Did you believe when you were there and do you assert today that the environment in which young Katherine lived was a good environment as far as the accommodations are concerned?
"[Webber]: The accommodations were suitable for Katherine, yes.
"[Defense counsel]: And during the time that you were there in that year and a half, were you-or during the time that Katherine was there and the three of you lived under the same roof, did you notice the things that Mr. Russell would do with Katherine in terms of her education, for example?"
(R. 1094-95.)
On redirect, the State was allowed to expound on Russell's struggle with alcohol and Webber testified that Russell had driven while intoxicated "on several occasions" with Katherine in the car, that Webber had found vodka in Russell's car, that she had asked Russell's family for help regarding Russell's alcoholism, that drinking alcohol in excess lowered Russell's inhibitions, causing him to walk around nude inside the house, and that Russell's alcoholism caused Webber and Russell's relationship to be very volatile. (R. 1111.) Webber also testified that Russell was admitted but failed to complete a detox program for alcoholics and an outpatient program for alcoholics. (R. 1113.)
The State argues in its brief to this Court that Webber's testimony concerning Russell's drinking and its effect was admissible *419 under the doctrine of curative admissibility. We agree.
In Ex parte D.L.H., 806 So.2d 1190 (Ala.2001), the Alabama Supreme Court discussed the concept of "curative admissibility:"
"When one party opens the door to otherwise inadmissible evidence, the doctrine of 'curative admissibility' provides the opposing party with 'the right to rebut such evidence with other illegal evidence.' McElroy's Alabama Evidence, § 14.01, p. 49 (5th ed.1996). '[T]he law [is] that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional.' Clark v. State, 54 Ala.App. 183, 186, 306 So.2d 51, 54 (1974). ' "A party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject." ' Hubbard v. State, 471 So.2d 497, 499 (Ala.Crim.App.1984) (quoting Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App.1980), cert. denied, 392 So.2d 1266 (Ala.1981) )."
806 So.2d at 1193. "The prosecution was entitled, on redirect, to further explore matters elicited during cross-examination by defense counsel." Mangione v. State, 740 So.2d 444, 455 (Ala.Crim.App.1998). This evidence was properly admitted during Webber's testimony.
Moreover, even if the evidence was not admissible, its admission was harmless beyond a reasonable doubt.
" 'Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.' R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997) ; Hobbs v. State, 669 So.2d 1030 (Ala.Crim.App.1995). The standard for determining whether error is harmless is whether the evidence in error was 'harmless beyond a reasonable doubt.' Schaut v. State, 551 So.2d 1135, 1137 (Ala.Crim.App.1989), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)."
McAdory v. State, 895 So.2d 1029, 1036 (Ala.Crim.App.2004). See Ex parte Vaughn, 869 So.2d 1090, 1098 (Ala.2002).
In his guilt-phase opening statement, Russell's counsel basically conceded that the State could prove that Russell fired the shot that killed Katherine, but he argued that the issue for the jury was whether Russell had any intent to kill Katherine. The gunshot that killed Katherine was fired while the muzzle of the gun was pressed against her head. Russell's bloody footprints were on the laundry-room floor and Russell had moved Katherine's body to his Escalade automobile. There was no testimony indicating that Russell was intoxicated when Katherine was shot. The only testimony regarding Russell's sobriety on the day Katherine was shot came from Katherine's day-camp counselor who testified that she was certain that Russell was sober at 6:00 p.m. before the shooting that took place at some point between 6:30 p.m. and 8:30 p.m. Nothing in the record suggests that alcohol was a factor in the shooting.
This Court is confident that the admission of the above testimony concerning Russell's problems with alcohol was harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and that the circuit court's failure to sua sponte give a limiting instruction on the use of that evidence was harmless. See R.C.W. v. State, 168 So.3d 102 (Ala.2014). Russell is due no relief on this claim.
*420 VII.
Russell next argues that alleged prosecutorial misconduct during opening and closing arguments undermined the reliability of the jury's verdict and warrants a new trial. Russell makes several different claims in support of this contention. Russell did not object to the now challenged instances of prosecutorial misconduct. Therefore, we review these claims for plain error. See Rule 45A, Ala. R.App. P.
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974) ), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992). "A prosecutor may argue every legitimate inference from the evidence 'and may examine, collate, [sift] and treat the evidence in his own way.' " Woodward v. State, 123 So.3d 989, 1028 (Ala.Crim.App.2011). When considering whether a prosecutor's argument constituted error: "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
As stated above, Russell did not object to any of the now challenged instances of prosecutorial misconduct. When considering whether an argument constitutes plain error, the Alabama Supreme Court in Ex parte Windsor, 683 So.2d 1042 (Ala.1996), stated:
" ' "While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). "This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).' "
Ex parte Windsor, 683 So.2d 1042, 1061 (Ala.1996), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990).
*421 The circuit court instructed the jury that arguments of counsel were not evidence. (R. 1670.)
A.
First, Russell argues that it was error for the prosecutor to argue that Russell chased Katherine and trapped her behind the dryer because, he says, there was no direct evidence to support this argument.
"Liberal rules are allowed counsel in drawing inferences from the evidence in their argument to the jury, whether they are truly drawn or not." Sasser v. State, 494 So.2d 857, 860 (Ala.Crim.App.1986). "[P]rosecutors are to be allowed wide latitude in their exhortations to the jury." Armstrong v. State, 516 So.2d 806, 809 (Ala.Crim.App.1986). "Counsel may draw remote deductions and inferences from the evidence and there is no basis for objection even if the deductions and inferences are illogical or unreasonable." Callahan v. State, 179 Ga.App. 556, 563, 347 S.E.2d 269, 278 (1986).
" 'Trial judges ordinarily are loath to limit inferential argument which has any connection with the evidence even though far-fetched.... So long as counsel does not travel out of his case and confines statements to reasonable inferences deducible from the evidence, he should not be controlled.' Roberts [v. State ], 346 So.2d [473] at 477 [ (Ala.Crim.App.1977) ]. "[I]t would be dangerous to accord to the presiding judge the right and power to intervene, and declare authoritatively when an inference of counsel is or is not legitimately drawn. This is for the jury to determine, if there be any testimony on which to base it." Cross v. State, 68 Ala. 476, 483 (1881)."
Kuenzel v. State, 577 So.2d 474, 493-94 (Ala.Crim.App.1990).
" 'Counsel in the trial of any lawsuit has the unbridled right (to be sure, the duty) to argue the reasonable inferences from the evidence most favorable to his client.' " Johnson v. State, 553 So.2d 645, 647 (Ala.Crim.App.1989), quoting Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala.1986).
"In order for unsupported prosecutorial statements of fact to require reversal, the objectionable statements must be (1) made as of fact, (2) without support by any evidence, (3) pertinent to the issues, and (4) have a natural tendency to influence the finding of the jury."
Jones v. State, 456 So.2d 366, 375 (Ala.Crim.App.1983). See also Johnson v. State, 256 So.3d 684 (Ala.Crim.App.2014) ; Ballard v. State, 767 So.2d 1123 (Ala.Crim.App.1999).
Here, forensic evidence showed that Katherine was shot as she was crouched behind the dryer and the wall in a 12-inch "cubby area." The prosecutor's argument was a reasonable inference that could have been drawn from the forensic evidence presented at trial and did not constitute error, much less plain error. Russell is due no relief on this claim.
B.
Russell argues that the prosecutor made two arguments that, he says, inflamed the passions of the jury and resulted in reversible error.
1.
Russell argues that the prosecutor improperly argued victim-impact evidence in the guilt phase of his trial. Specifically, he challenges the following statement made at the beginning of the prosecutor's closing arguments: "Eleven year old Katherine Helen Gillespie, a beautiful, bright, precious little girl with a future full of *422 promise, loved by everyone, young and old alike." (R. 1611.)
The Alabama Supreme Court in Ex parte Rieber, 663 So.2d 999 (Ala.1995), addressed whether it was error to allow victim-impact testimony in the guilt phase of a capital-murder trial. The court, finding any error harmless, stated:
"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected-that [the victim] was not a 'human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991) )."
663 So.2d at 1005-06. "[T]he admission of victim-impact evidence and argument regarding that evidence does not necessarily require reversal of a conviction, but may be harmless under Rule 45, Ala. R.App. P." McCray v. State, 88 So.3d 1, 37 (Ala.Crim.App.2010).
In this case, the prosecutor's statements were harmless. See Ex parte Rieber, supra. Neither did the comments "so infect the trial with unfairness" that Russell was denied due process. See Darden v. Wainwright, supra. Russell is due no relief on this claim.
2.
Russell next argues that the prosecutor further inflamed the jury by stating: "That's what's great about our justice system here in the United States established by the Constitution, ordained by God." (R. 1630.) (Emphasis added.) This comment was made in the prosecutor's rebuttal closing argument, and Russell did not object.
Although Alabama has not specifically addressed the validity of similar arguments, the State of North Carolina has addressed this issue:
"Arguments of counsel are left largely to the control and discretion of the trial judge. [ State v.] Davis, 349 N.C. [1] at 44, 506 S.E.2d [455] at 479 [ (1998) ]. Counsel is permitted 'wide latitude in the argument of hotly contested cases.' Id. Improper biblical remarks occur when the prosecutor argues that the law of this State is divinely inspired or that law officers are ordained by God. Id. at 47, 506 S.E.2d at 480 (citations omitted)."
State v. Pulley, 180 N.C.App. 54, 69, 636 S.E.2d 231, 242 (2006).
Nonetheless, there is no error when a circuit court instructs the jury that it is to apply the law as instructed by the court:
"Although we may believe that parts of our law are divinely inspired, it is the secular law of North Carolina which is to be applied in our courtrooms. Our trial courts must vigilantly ensure that counsel for the State and for defendant do not distract the jury from their sole and exclusive duty to apply secular law. Nevertheless, particularly in light of the trial court's final instructions directing the jury in the present case to apply the law as given them by the trial court and not by counsel, we do not find the argument complained of here to be so grossly improper as to have required the trial court to intervene ex mero motu."
State v. Williams, 350 N.C. 1, 27, 510 S.E.2d 626, 643 (1999).
Here, the circuit court instructed the jury that arguments of counsel were not *423 evidence and that its verdict must be based on the law and the facts of the case. (R. 1670.) For these reasons, we find no reversible error in the prosecutor's argument.
C.
Russell argues that the prosecutor improperly bolstered the testimony of the State's witnesses when he made the following argument:
"We are very fortunate here in Shelby County that we have the men and women of our sheriff's office, the men and women of the Department of Forensic Sciences who have dedicated their lives to allowing truth to come out in the courtrooms of this county. Very appreciative of that because it allows the truth to be told....
"I had a rare privilege yesterday. When Angelo Della Mann was testifying when we had the model constructed, I needed to be able to see what you see and I couldn't because I was back there. So as he testified, I came and sat here on this floor so that I could see what Angelo was demonstrating. I know what he showed you, because as I sat on that-y'all remember it was plexiglass across the front of that?
"As I watched Angelo tell you how Katherine was positioned when the defendant executed her, I could not only see what Angelo was telling you-which was probably the best I have ever felt in a courtroom because it's the truth coming out. It's the truth coming out.
"But what made that moment the proudest moment of my life was that in that reflected plexiglass I could see your faces. I watched your faces as you saw what happened to Katherine. I could see the horror. I could see the truth in your faces because you knew it. You may have known it before then but you certainly knew it then.
"And it was almost more than I could bear, because as we saw that testimony especially at the end of the week combined with everything else, we saw the truth. You saw the truth of how Katherine died and it was too much."
(R. 1648-49.)
" 'Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility.' United States v. Bernal-Benitez, 594 F.3d 1303, 1313 (11th Cir.2010)." United States v. Sosa, 777 F.3d 1279, 1295 (11th Cir.2015). However, in this case,
"[t]he prosecutor was merely commenting on the investigation conducted by the police officers. That they did a good job in their investigation is a reasonable inference which was properly drawn from the evidence presented at trial. Moreover, the prosecutor was not injecting his own knowledge or experience into the argument, nor was he indicating a personal belief in the veracity of the witnesses' statements. 'During closing argument, the prosecutor as well as defense counsel has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.'..."
Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984).
Here, like Waldrop, the prosecutor was commenting on the thorough investigation that had been conducted by law enforcement-a permissible argument. Moreover, the argument did not so infect the trial with unfairness that Russell was denied due process. See Darden v. Wainwright, supra. Russell is due no relief on this claim.
*424 D.
Russell further argues that the prosecutor misled the jury as to who had the burden of proving an element of the crime when he made the following argument:
"Folks, [Russell] had an awesome escape plan after he murdered her. He just got interrupted in the middle of executing it. What would he have done with her body if Emily hadn't caught him, hadn't stopped it? Okay. So it may sound like an imperfect plan. I will tell you how perfect it was and it's something they don't want to talk about. They didn't mention it."
(R. 1638.) This comment was made in the prosecutor's rebuttal argument, and Russell did not object.
Here, "[t]he prosecutor's comment was directed to the strength of the State's case and to the corresponding weakness in the defense's theory of the case, and it was a fair comment based on the prosecutor's inferences from all of the evidence in the case. The comment did not shift the burden of proof." Woodward v. State, 123 So.3d 989, 1028 (Ala.Crim.App.2011). The prosecutor's argument was permissible. There was no error, much less plain error, in regard to this claim, and Russell is due no relief.
E.
Russell last argues that the cumulative effect of the prosecutor's misconduct requires that he be given a new trial.
The Alabama Supreme Court recognized in Ex parte Tomlin, 540 So.2d 668, 672 (Ala.1988), that the cumulative effect of prosecutorial misconduct may require a new trial.
"To the extent that [the appellant] argues that these alleged individual errors resulted in cumulative error that required a reversal of his conviction, ' " '[b]ecause we find no error in the specific instances alleged by the appellant, we find no cumulative error.' Lane v. State, 673 So.2d 825 (Ala.Crim.App.1995). See also McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000)." Calhoun v. State, 932 So.2d 923, 974 (Ala.Crim.App.2005).' Harris v. State, 2 So.3d 880, 928 (Ala.Crim.App.2007), cert. denied, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009)."
Revis v. State, 101 So.3d 247, 325 (Ala.Crim.App.2011). We likewise find no cumulative error in this case that would entitle Russell to any relief.
VIII.
Russell next contends that the circuit court erred when it denied his motion for a judgment of acquittal because, he says, the State failed to establish sufficient evidence to prove that he "intentionally killed or even killed Katherine Gillespie." (Russell's brief, p. 70.)
Russell was charged with, and convicted of, capital murder under § 13A-5-40(a)(15), by murdering Katherine, a child less than 14 years of age. Thus, the State had to prove an intentional murder, as defined in § 13A-6-2(a)(1), Ala.Code 1975, and that Katherine was less than 14 years of age at the time she was murdered.
" ' "In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.' " Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ' "The test used in determining the sufficiency of evidence to sustain a *425 conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt." ' Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ' "When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision." ' Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). 'The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
" 'The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).'
" Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992)."
Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App.2003).
"Where a defendant's conviction is based solely on circumstantial evidence, 'if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.' Ex parte Brown, 499 So.2d 787, 788 (Ala.1986) (emphasis in original). 'Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). 'Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Crim.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985). 'It is not necessary for a conviction that the defendant be proved guilty to the "exclusion of every possibility of innocence." ' Burks v. State, 117 Ala. 148, 23 So. 530 (1898). 'The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.' Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895)."
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989).
A.
Russell first argues that the State failed to prove that he had the intent to *426 kill Katherine. Specifically, he argues that the State presented no witness to the murder, that the alleged murder weapon did not have Russell's fingerprints on it, and that the evidence concerning the murder weapon was "conflicting, inconclusive, and insignificant." (Russell's brief, at p. 64.)
"Alabama appellate courts have repeatedly held that, to be convicted of [a] capital offense and sentenced to death, a defendant must have had a particularized intent to kill." Ziegler v. State, 886 So.2d 127, 140 (Ala.Crim.App.2003).
"[I]ntent to kill may be 'inferred from the use of a deadly weapon or other attendant circumstances.' [ Garrison v. State, 521 So.2d 997, 1005 (Ala.Cr.App.1986).] ' "Because the element of intent, being state of mind or mental purpose, is usually incapable of direct proof, it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances." ' Benton v. State, 536 So.2d 162, 164 (Ala.Cr.App.1988), quoting Johnson v. State, 390 So.2d 1160, 1167 (Ala.Cr.App.1980)."
Lorance v. State, 770 So.2d 644, 649 (Ala.Crim.App.1999).
" 'Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.' Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908)." McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986). " 'The intent of a defendant at the time of the offense is a jury question.' " C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993).
In this case, there was ample evidence presented by the State from which a jury could have reasonably concluded that Katherine's murder was an intentional act. Katherine was shot in the head, with the muzzle of the gun in direct contact with her head. The evidence showed that Katherine was wearing a cap at the time she was shot. When she was shot, Katherine was in the laundry room in a 12-inch "cubby area" between a clothes dryer and a wall in a crouched position with her head and body below the top of the dryer. There was no evidence indicating that Russell telephoned emergency 911 or that he sought any aid following the shooting. Bloody clothes were found in the tub of the washing machine, and the tub was full of water. Katherine's body had been placed in a plastic garbage can so that her bloody head rested at the bottom of the container and her body was placed on the backseat floorboard of Russell's Escalade automobile. It is clear from the "character of the assault, the use of a deadly weapon and other attendant circumstances," Lorance v. State, 770 So.2d at 649, that the trial court did not err in submitting the question of Russell's intent to the jury. There was more than sufficient evidence from which the jury could conclude that Russell intentionally killed Katherine by holding a gun against her head and pulling the trigger.
Contrary to Russell's assertions, the circuit court did not err in submitting the case to the jury to determine whether Russell had the intent to kill Katherine.
B.
Second, Russell contends that the State did not prove beyond a reasonable doubt that he caused Katherine's death.[11] Specifically, he argues that the bullet fragments *427 taken from Katherine's brain could not be positively identified as having been fired from any pistol belonging to Russell, that his fingerprints were not found on any gun authorities believed might have been the murder weapon, and that there was no blood on the pistol from which the fatal shot is believed to have been fired despite the fact that the muzzle was pressed against Katherine's head.
The State's evidence showed that Russell and Katherine were at home alone when the shooting occurred. Forensic evidence showed that Katherine was shot in her head with a .40-caliber bullet. A .40-caliber shell casing was found in the laundry room in the tub of a washing machine located a few feet from where Katherine was shot. Ballistic evidence showed that this shell casing had been fired from a .40-caliber pistol that belonged to Russell. The pistol that fired this shot was discovered hidden underneath a sofa in Russell's garage. Katherine was shot in the laundry room, and Russell's bloody footprints were on the laundry room floor. Katherine's body was moved from the laundry room and placed in the backseat floorboard of Russell's Escalade automobile. Emily Webber testified that as she was driving past Russell's house, at approximately 8:30 p.m., she saw a figure inside the house using a flashlight. Webber also testified that she saw someone she believed to be Russell standing in the dark inside the garage next to the Escalade that contained Katherine's body but that he would not respond to her calls from outside the garage. Russell locked himself in his bathroom, where he apparently tried to commit suicide before being rescued by police.
Clearly, there was sufficient evidence from which the jury could conclude that Russell intentionally killed Katherine. The circuit court did not err in denying Russell's motion for a judgment of acquittal. "There is no reason to disturb the jury's verdict in this case." Doster v. State, 72 So.3d 50, 98 (Ala.Crim.App.2010). Russell is due no relief on this claim.
IX.
Russell next argues that the circuit court erred in its jury instructions in the guilt phase. He makes several different arguments in support of this contention.
"A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, ' "the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together." ' Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987) ); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992) ; Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992)."
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).
A.
Russell contends that the trial court erred in overruling his objection to the jury instructions regarding flight. During the guilt phase charge conference, the State requested a jury charge on flight or attempted flight. Russell argued that it would be error to charge the jury on flight because there were no facts to support such a charge. Defense counsel argued: "[I]t would be a strain ... in this case to say that there was an attempted flight." (R. 1566.) The circuit court stated that it intended to instruct the jury that it was up to it to determine whether evidence of *428 flight had been presented. (R. 1573.) Russell again objected.
" ' " 'In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution ... as tending to show the accused's consciousness of guilt.... The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight.' C. Gamble, McElroy's Alabama Evidence 190.01(1) (3rd ed.1977). 'Evidence of flight is admissible even though it is weak or inconclusive....' Tate v. State, 346 So.2d 515, 520 (Ala.Cr.App.1977).... [E]vidence that the accused resisted or attempted to avoid arrest is admissible. Crenshaw v. State, 225 Ala. 346, 348, 142 So. 669 (1932).... Any act proving or tending to prove the accused's effort or desire to obliterate, destroy, or suppress evidence of a crime is relevant and admissible even if it involves evidence of a separate offense. Watwood v. State, 389 So.2d 549, 551 (Ala.Cr.App.), cert. denied, Ex parte Watwood, 389 So.2d 552 (Ala.1980)." '
"See also Ex parte Weaver, 678 So.2d 284 (Ala.), on remand, 678 So.2d 292 (Ala.Cr.App.1996) (quoting [ Ex parte ] Jones, [541 So.2d 1052, 1053-57 (Ala.1989) ], in depth)."
Smith v. State, 795 So.2d 788, 827-29 (Ala.Crim.App.2000), quoting Beaver v. State, 455 So.2d 253, 257 (Ala.Crim.App.1984).
In this case, the State asserted that Russell began his effort to cover up his crime when he placed Katherine's body in a trash can and put that can in his Escalade; that Webber arrived and interrupted his plan to dispose of Katherine's body; that the second shell casing, rubber gloves, and other contents of the book bag found near Katherine's body were items Russell intended to use to stage his own death; that Russell tried to destroy evidence by hiding a .40-caliber pistol under a sofa; and that Russell tried to destroy evidence by attempting to wash his and Katherine's clothes to get rid of the bloodstains.
The jury was charged as follows regarding flight:
"In weighing the facts of this case, any flight or attempted flight by the defendant that you may find may be considered by you in regard to the consciousness of guilt of the defendant in this case.
"All evasions or attempt to evade justice by the defendant are circumstances from which a consciousness of guilt may be inferred if connected with other incriminating facts including but not limited to any evidence that you may find proving or tending to prove the defendant's effort or desire to obliterate, destroy or suppress evidence of a crime.
"You may however find that any evidence of flight or efforts to obliterate, destroy or suppress evidence of a crime is for some reason other than consciousness of guilt for either the crime charged or any one or the lesser-included crimes as previously charged. That is for you to decide. That is a matter of fact for you to decide. The State is not required to prove motive as an element in this case."
(R. 1661-62.)
The facts of this case provided sufficient evidence to place before the jury the question whether Russell engaged in flight or in any efforts to destroy or conceal evidence of his crime. The circuit court's instruction did not characterize Russell's conduct as flight, but instead left that determination to the jury. The circuit court properly granted the State's request to *429 instruct the jury on flight. Russell is due no relief on this claim.
B.
Russell argues that the jury instruction on reasonable doubt was erroneous because, he says, it lessened the State's burden of proof and implied that Russell had a burden of proof.
Russell did not object to the circuit court's instruction on reasonable doubt; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The circuit court gave the following instruction on reasonable doubt:
"You have heard me use the term reasonable doubt, beyond a reasonable doubt and that's the State's burden. What do I mean by that term? The burden of proving the defendant is guilty as charged rests upon the State, and before a conviction can be had in this case, as in every case, the State must satisfy each and every member of the jury of the defendant's guilt, and unless the State does so, then he is entitled to an acquittal.
"The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. It may help you some-excuse me. It may help you some to say that the doubt which would justify an acquittal must be a doubt which reasonable men and women can seriously entertain.
"If after considering all the evidence in this case you have an abiding conviction of the truth of the charge, that you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant.
"The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague or conjectural or speculative doubt but it is a reasonable doubt arising from all or some part of the evidence or from the lack of evidence remaining after a careful consideration of the testimony such as reasonable, fair minded and conscientious men and women would entertain under all circumstances.
"You will observe that the State is not required to convince you of the defendant's guilt beyond all doubt but rather beyond all reasonable doubt. The State's burden is not to prove the defendant's guilt as to an absolute or mathematical certainty but to an evidentiary certainty.
"If after comparing and considering all the evidence as to each count or as to the count of capital murder and then if you move to the lesser crimes your minds are left in such a condition that you cannot say that you have an abiding conviction of the defendant's guilt, then you are not convinced beyond a reasonable doubt and the defendant would be entitled to an acquittal."
(R. 1663-64; emphasis added.)
"The instruction on reasonable doubt that the trial court provided to the jury here incorporated the language found in the Alabama Pattern Jury Instructions on reasonable doubt. The pattern jury instructions inform jurors that their doubt cannot be based on 'a mere guess or surmise'.... It also informs jurors that reasonable doubt that 'entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt.' Alabama Pattern Jury Instructions: Criminal, Instructions 1.4 and 1.5 (3d ed.1994). ' " 'A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error.' " Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), quoting Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, *430 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).' Snyder v. State, 893 So.2d 488, 550 (Ala.Crim.App.2003)."
Harris v. State, 2 So.3d 880, 913 (Ala.Crim.App.2007).
The phrase that Russell objects to is contained in the pattern jury instructions on reasonable doubt. We have approved of a trial court's use of very similar jury instructions. See Vanpelt v. State, 74 So.3d 32, 83 (Ala.Crim.App.2009). The circuit court's instructions on reasonable doubt did not constitute error, much less plain error. Russell is due no relief on this claim.
X.
Russell next argues that the cumulative effect of the errors committed at trial entitle him to a new trial.
It is well settled that
"while, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have 'probably injuriously affected substantial rights of the parties,' then the cumulative effect of the errors may require reversal."
Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001).
Applying the standard set out in Ex parte Woods, this Court is convinced that individually or cumulatively no error or errors occurred that would entitle Russell to relief. See Brownfield v. State, 44 So.3d 1, 33 (Ala.Crim.App.2007).
Penalty-Phase Issues
XI.
Russell further argues that Alabama's method of execution-lethal injection-is unconstitutional because, he says, it is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Russell's entire argument consists of merely one paragraph in his brief to this Court.
"[C]apital punishment is constitutional. It necessarily follows that there must be a means of carrying it out." Baze v. Rees, 553 U.S. 35, 47, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).
"In Baze, two death-row inmates challenged Kentucky's use of the three-drug protocol, arguing 'that there is a significant risk that the procedures will not be properly followed-in particular, that the sodium thiopental will not be properly administered to achieve its intended effect-resulting in severe pain when the other chemicals are administered.' 553 U.S. at 49, 128 S.Ct. at 1530. Belisle's claim, like the claims made by the inmates in Baze, 'hinges on the improper administration of the first drug, sodium thiopental.' Baze, 553 U.S. at 53, 128 S.Ct. at 1533.
"The Supreme Court upheld the constitutionality of Kentucky's method of execution, Baze, 553 U.S. at 62, 128 S.Ct. at 1538, and noted that '[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.' Baze, 553 U.S. at 61, 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that 'Kentucky's protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.' Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama's procedures, along with procedures used in Missouri, California, and Indiana 'provide *431 a degree of assurance-missing from Kentucky's protocol-that the first drug had been properly administered.' Baze, 553 U.S. at 121, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
"The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama's lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. 'Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of "objectively intolerable risk of harm" that qualifies as cruel and unusual.' Baze, 553 U.S. at 50, 128 S.Ct. at 1531. Thus, we conclude that Alabama's use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution."
Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008).
"Because Alabama's method of performing lethal injection is 'substantially similar' to the one considered by the United States Supreme Court in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), it is not 'cruel and unusual,' and, consequently, [the appellant] is not entitled to relief on this claim." Shanklin v. State, 187 So.3d 734, 767 (Ala.Crim.App.2014). Compare Sepulvado v. Jindal, 729 F.3d 413, 417 (5th Cir.2013) ("Baze addressed Kentucky's three-drug protocol, but 'a one drug protocol [is] also acceptable under the flexible Baze standard....' ").
Pursuant to § 12-3-16, Ala.Code 1975,[12] this Court is bound by the decisions of the Alabama Supreme Court. Accordingly, we must conclude that pursuant to Ex parte Belisle, Russell is entitled to no relief on this claim.
XII.
Russell next argues that prosecutorial misconduct in the penalty phase denied him a fair trial. He makes several arguments in support of this contention. Russell failed to object to any of the now challenged instances of prosecutorial misconduct; therefore, we review these claims for plain error. See Rule 45A, Ala. R.App. P.
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974) ), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). 'In order to constitute reversible *432 error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992)
In reviewing prosecutorial argument for plain error, we have stated:
" 'While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106] at 1111 [ (Ala.1985) ] (emphasis in original). 'This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). 'Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990). "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." United States v. Young, 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).
"Prosecutorial misconduct can be a basis for relief if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quotations omitted). In determining whether arguments are sufficiently egregious to result in the denial of due process, we have considered the statements in the context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. Romine v. Head, 253 F.3d 1349, 1369-70 (11th Cir.2001)."
Land v. Allen, 573 F.3d 1211, 1219-20 (11th Cir.2009).
"Closing arguments are rarely scripted with precision." People v. Tillery, 231 P.3d 36, 44 (Colo.App.2009). "Prosecutorial misconduct in closing argument rarely constitutes plain error." People v. Weinreich, 98 P.3d 920, 924 (Colo.App.2004). See also Gonzales v. State, 685 S.W.2d 47, 49 (Tex.Crim.App.1985) ("Appellate courts rarely reverse a conviction due to an improper prosecutorial question.").
A.
Russell argues that it was reversible error for the prosecutor to make the following argument in his opening statement in the penalty phase:
"The image that I have-I don't think you can escape having this image emblazoned in your mind is Katherine Gillespie stuffed into a trash can in the back of that Escalade. How can you escape that? I take it home with me every night. I'm sure you do too at this point.
*433 "And now it's about Ryan Russell but, you know, unlike what he did, as a society, we don't just dispose of people. We don't throw them away.
"In court, we have a process we go through. We have a system. We have laws. We have evidence. We have reason and we have, I hope, justice and that's what we are looking for."
(R. 1740.)
"[P]rosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." People v. Ullah, 216 Mich.App. 669, 679, 550 N.W.2d 568, 574 (1996). This argument did not so infect Russell's penalty phase with unfairness that Russell was denied due process. See Darden v. Wainwright, supra. Russell is due no relief on this claim.
B.
Russell next argues that the prosecutor improperly used religion to stir the passions of the jury. Specifically, he challenges the following argument made at the very beginning of the prosecutor's closing: "Tiny Angel, rest your wings and sit with me a while." (R. 1804.)[13]
"Criminal trials are adversary proceedings, and as stated in other opinions, are not social affairs. Argument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings."
Wright v. State, 279 Ala. 543, 550-51, 188 So.2d 272, 279 (1966).
"[A]lthough some states forbid any biblical references in closing arguments- State v. Berry, 141 S.W.3d 549 (Tenn.2004), and Fontenot v. State, 881 P.2d 69 (Okla.Crim.App.1994) -Alabama has recognized that 'counsel's argument should not be so restricted as to prevent reference, by way of illustration, ... to principles of divine law or biblical teachings,' [ Ex parte] Waldrop, 459 So.2d [959] at 963 [ (Ala.1984) ]. However, we have also held that the discretion to argue biblical references is not unlimited."
Gobble v. State, 104 So.3d 920, 978 (Ala.Crim.App.2010). See also State v. Wilson, 16 Wash.App. 348, 357, 555 P.2d 1375, 1380 (1976) (appellate court upheld argument where prosecutor referred to victim as "that little angel").
This argument did not constitute error, much less plain error, and Russell is due no relief on this claim.
XIII.
Russell argues that the circuit court erred in allowing certain victim-impact testimony to be admitted at the penalty phase of his trial. Specifically, he argues that it was error to allow Ellen Moman, one of Katherine's camp counselors, to testify concerning the impact of Katherine's death on other children at the camp because, he says, Moman was not related to Katherine and because her testimony violated § 15-23-73, Ala.Code 1975.
Russell made no objection to Moman's testimony; therefore, we review this claim for plain error only. See Rule 45A, Ala. R.App. P.
Section 15-23-73(a), Ala.Code 1975, states:
*434 "The victim may submit a written impact statement or make an oral impact statement to the probation officer for use in preparing a pre-sentence report. The probation officer shall consider the economic, physical, and psychological impact that the criminal offense has had on the victim and the immediate family of the victim."
(Emphasis added.)
What Russell fails to consider is that the admission of evidence at the penalty phase of a capital-murder trial is not governed by § 15-23-73, Ala.Code 1975, but by § 13A-5-45(d), Ala.Code 1975, which provides: "Any evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence...."
The United States Court of Appeals for the Tenth Circuit addressed a similar issue as it relates to 18 U.S.C. § 3593(a).[14] In finding that this statute did not restrict the victim-impact testimony to only family members, the federal court stated:
"[ United States v.] Barrett [, 496 F.3d 1079 (10th Cir.2007),] involved a challenge to victim-impact testimony from two friends of the victim regarding the effect his life and death had on them. The defendant objected to this testimony, arguing 'that Congress has expressly limited impact evidence in federal death penalty cases to evidence concerning the effect of the offense on the victim and the victim's family.' 496 F.3d at 1098. We recognized the FDPA's [Federal Death Penalty Act] specific reference to 'the effect of the offense on' and 'loss suffered by' 'the victim's family.' Id. at 1098-99 (quoting 18 U.S.C. § 3593(a) ). But, citing (1) the statute's additional inclusive reference to 'any other relevant information,' id. at 1099 (same), and (2) case law permitting evidence 'giving the jury a glimpse of the victim's personality and the life he led,' id ., we rejected the defendant's rigid view of victim-impact evidence. We approved the challenged evidence, including testimony by 'a longtime friend of [the victim], describing ... the impact [the victim] had on his life,' and by 'a fellow Oklahoma Highway Patrol trooper, ... describing the impact [the victim's] death had on him.' Id. Similar evidence from friends in this case was likewise admissible."
United States v. Fields, 516 F.3d 923, 946-47 (10th Cir.2008).
"In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court partially overruled Booth to allow the sentencing authority to consider evidence of the effect of the victim's death upon family and friends." Ex parte Washington, 106 So.3d 441, 445 (Ala.2011) (emphasis added).
Victim-impact testimony from friends and coworkers is routinely admitted at the penalty phase of a capital-murder trial.
"Other circuits allow testimony from friends (including friends who are co-workers) regarding the impact of a victim's death, rejecting challenges similar to Wilson's. [United States v.] Barrett, 496 F.3d [1079] at 1098 [ (10th Cir.2007) ] (allowing testimony from police colleagues of victim, and rejecting argument that Congress limited victim impact *435 evidence in federal death penalty cases to evidence 'concerning the effect of the offense on the victim and the victim's family' (internal quotation marks and citation omitted)); see also [United States v.] Fields, 516 F.3d [923] at 946 [ (10th Cir.2008) ] (allowing victim impact testimony from non-family members); [United States v.] Nelson, 347 F.3d [701] at 712-13 [ (8th Cir.2003) ] (same); [United States v.] Bernard, 299 F.3d [467] at 478 [ (5th Cir.2002) ] (same)."
United States v. Whitten, 610 F.3d 168, 188-89 (2d Cir.2010). See also United States v. Runyon, 667 F.Supp.2d 648, 650 (E.D.Va.2009) ("[T]he evidence presented from the victim's friends and shipmates provided the jury with information upon which it could make an individualized assessment of the defendant and the circumstances of the offense in determining the appropriate sentence."); State v. Raines, 362 N.C. 1, 15, 653 S.E.2d 126, 135 (2007) ( "Victim impact testimony is admissible to show the effect the victim's death had on friends and family members....").
Contrary to Russell's argument, this Court has not restricted the admission of victim-impact evidence at the penalty phase of a capital-murder trial to only family members of the victim. Indeed, such a narrow interpretation would be inconsistent with § 13A-5-45(d), Ala.Code 1975. The circuit court committed no error, much less plain error, in allowing Moman's testimony, and Russell is due no relief on this claim.
XIV.
Russell argues that several of the circuit court's jury instructions in the penalty phase were erroneous. Russell did not object to the now challenged jury instructions; therefore, we apply the plain-error standard of review. See Rule 45A, Ala. R.App. P.
" ' "The trial court is vested with broad discretion in formulating its charge, so long as it accurately reflects the law." ' Powers v. State, 963 So.2d 679, 691 (Ala.Crim.App.2006), (quoting Clark v. State, 621 So.2d 309, 324 (Ala.Crim.App.1992) ). See also Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999). 'When reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).' Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000)."
Marshall v. State, 20 So.3d 830, 836 (Ala.Crim.App.2008).
" 'In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that "an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner." Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).' "
Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998).
A.
Russell argues that the circuit court's instructions concerning the weighing of the aggravating and the mitigating circumstances was unconstitutional. Specifically, he argues that the charge failed to instruct the jury what to do if the *436 aggravating and the mitigating circumstances were equally balanced.
The circuit court gave the following instruction on the process of weighing the aggravating circumstances and the mitigating circumstances:
"Now ladies and gentlemen, if after a full and fair consideration of all the evidence in this case you are convinced beyond a reasonable doubt that at least the one aggravating circumstance of especially heinous, atrocious or cruel exists in this case and you are convinced that this aggravating circumstance outweighs the mitigating circumstances, your verdict would be this verdict form which says we, the jury, recommend the defendant, Ryan Gerald Russell, be sentenced to death. The vote is as follows. There is a blank by death and a blank for life imprisonment. And again to reiterate in order to return this verdict, the life-the death number must be ten or greater.
"However, if after a full and fair consideration of all the evidence you are not convinced beyond a reasonable doubt that at least one aggravating circumstance exists, especially heinous, atrocious or cruel or that even if you do find that aggravating circumstance exists that it does not outweigh the mitigating circumstances in this case that you may find, then your verdict must be we, the jury, recommend that the defendant, Ryan Gerald Russell, be punished by life imprisonment without parole. The vote is as follows. And again blank for death and blank for life without parole. In this case, the life without number must be at least seven in order to return this verdict form."
(R. 18280-29.)
The Alabama Supreme Court has held that an instruction on the weighing process rises to the level of plain error only when a trial court instructs a jury that it could recommend a sentence of death without finding any aggravating circumstance. See Ex parte Bryant, 951 So.2d 724 (Ala.2002). However,
"[t]he charge in this case was not infected with the peculiar error present in [ Ex parte ] Bryant [, 951 So.2d 724 (Ala.2002) ], that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error 'seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,' Ex parte Davis, 718 So.2d [1166,] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence."
Ex parte McNabb, 887 So.2d 998, 1004 (Ala.2004). See also Ex parte Mills, 62 So.3d 574 (Ala.2010) ; Ex parte Walker, 972 So.2d 737 (Ala.2007).
Here, the circuit court did not instruct the jury that it could recommend a sentence of death without finding the existence of any aggravating circumstance. Indeed, the circuit court specifically instructed the jury, several times, that it could not vote for a sentence of death unless it specifically determined that the aggravating circumstance that the offense was especially heinous, atrocious, or cruel had been proven beyond a reasonable doubt. The circuit court's jury instruction did not constitute plain error, and Russell is due no relief on this claim.
*437 B.
Russell next argues that the circuit court's instructions on mitigating circumstances were erroneous because, he says, they implied that the jury could not consider a mitigating circumstance unless all the jurors agreed upon its existence. Specifically, he argues that the circuit court's failure to give a specific instruction that the jury's findings as to mitigation did not have to be unanimous violated the Supreme Court's decision in Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).
"The United States Supreme Court in Mills v. Maryland held that if there was a substantial probability that a jury instruction in the penalty phase of a capital trial implied that a finding on a mitigating circumstance must be unanimous the death sentence must be vacated." Calhoun v. State, 932 So.2d 923, 972 (Ala.Crim.App.2005).
More recently, the United States Supreme Court in Smith v. Spisak, 558 U.S. 139, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010), again considered this issue and stated:
"[T]he instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously. Neither the instructions nor the forms said anything about how-or even whether-the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question. And the instructions repeatedly told the jury to 'conside[r] all of the relevant evidence.' ... In our view the instructions and verdict forms did not clearly bring about, either through what they said or what they implied, the circumstance that Mills found critical, namely,
" 'a substantial possibility that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.' 486 U.S., at 384, 108 S.Ct. 1860."
558 U.S. at 148.
Since Mills v. Maryland, many federal courts have upheld instructions similar to the instructions given in this case.
"[T]he trial court's jury instructions and verdict form contained no statement that reasonably could be read by jurors to require unanimity on mitigating factors. And Lucas can point us to no Supreme Court precedent clearly establishing that an affirmative instruction must be given when the trial court has not otherwise suggested that unanimity is mandatory."
Lucas v. Warden, Georgia Diagnostic & Classification Prison, 771 F.3d 785, 807 (11th Cir.2014).
"[W]e find that with regard to mitigating factors, these instructions contain no express requirement of unanimity-that is, they omit any requirement of unanimity. And, as we have previously held, 'the only reasonable reading of [such] instruction [i]s that, by omission, no unanimity [i]s required.' See Coe v. Bell, 161 F.3d 320, 338 (6th Cir.1998) (citing Kordenbrock v. Scroggy, 919 F.2d 1091, 1121 (6th Cir.1990) (en banc))."
Nichols v. Heidle, 725 F.3d 516, 546 (6th Cir.2013).
"[T]he failure to adequately instruct the jury on unanimity may be harmless where the jury is informed that aggravating circumstances must be unanimously found beyond a reasonable doubt and no *438 constraints are placed on the jury's ability to find mitigating circumstances."
Nika v. State, 124 Nev. 1272, 1297-98, 198 P.3d 839, 856 (2008).
The circuit court's instructions on the application of mitigating evidence did not constitute error, much less plain error, and Russell is due no relief on this claim.
XV.
Russell argues that § 13A-5-49(8), Ala.Code 1975, which sets out that the offense is especially heinous, atrocious, or cruel compared to other capital offenses, is unconstitutional on its face because, he says, it fails to "sufficiently minimize the risk that the death penalty will be applied in an arbitrary or capricious manner." (Russell's brief, at p. 90.)
"To the extent that [the appellant] is claiming that the 'especially heinous, atrocious or cruel' statutory aggravating circumstance found in § 13A-5-49(8), Ala.Code 1975, is unconstitutional on its face, that argument is without merit. See Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (1989), cert. granted, judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991) ; Hallford v. State, 548 So.2d 526, 541-42 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)."
Freeman v. State, 776 So.2d 160, 196 (Ala.Crim.App.1999). The especially heinous, atrocious, or cruel aggravating circumstance is not unconstitutional on its face-Russell is due no relief on this claim.
XVI.
Russell argues that the circuit court erred in failing to consider all of his proffered mitigating evidence. Specifically, he argues that the circuit court erred in not finding the following evidence to be mitigating: that Russell's parents divorced when he was young, that Russell was "alcohol dependent," that Russell was "managing properly in jail," that Russell was in the process of adopting Katherine, and that Russell had actively participated in Katherine's life.
" 'While Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.' " Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989). "It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer." Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.1991).
The circuit court acted within the scope of its discretion in declining to consider some evidence that was presented to be mitigation. Russell is due no relief on this claim.
XVII.
Russell next argues that the circuit court erred in finding that the murder was especially heinous, atrocious, or cruel as compared to other capital murders because, he says, there was no evidence indicating that the murder was "unnecessarily torturous" to the victim. The State asserts that there was sufficient evidence for the jury to find that Katherine was psychologically tortured before her death and that, therefore, this aggravating circumstances was properly applied in this case.
The circuit court made the following findings of fact on this aggravating circumstance:
*439 "The Court is in a significantly better position to evaluate this case as it is compared to capital cases. This is based not only upon the Court's personal experiences of having tried and sentenced other capital offenses, but also from reading those cases that are of record in the State of Alabama and in other jurisdictions. Heinous is defined as extremely wicked or shockingly evil. The Court can think of little that would be more wicked or shockingly evil, than for someone in a parental role to intentionally kill the one they are entrusted to love and protect. Atrocious is defined as outrageously wicked or violent.
"The evidence in this case tended to prove that Russell chased Katherine into a corner and put a gun to the back of her head and shot her. In light of the relationship of the victim and Defendant in this case, no act could be more outrageously wicked. The term cruel means designed to inflict a high degree of pain. The cruelty involved in this case does not only involve physical pain, it also involves mental and emotional pain. The mental and emotional pain of rejection and abuse experienced by a child when being killed by a person she called 'Daddy' is beyond comprehension.
"This crime does fit the definition of especially heinous, atrocious and cruel when compared to other capital offenses, because it was a pitiless crime. It was unnecessarily emotionally and psychologically torturous to the victim, an eleven year old girl, Katherine Helen Gillespie. The victim was the person that Russell had been entrusted to care for, love and protect, not only by his family, but by society. Russell had voluntarily undertaken that obligation."
(R. 156-57.)
"In Alabama, for the manner of homicide to meet the statutory definition of especially heinous, atrocious, or cruel, the murder must be unnecessarily torturous to the victim. See Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981). In making this determination we consider whether the violence involved in the killing was beyond what was necessary to cause death, whether the victim experienced appreciable suffering after a swift assault, and whether there was psychological torture. See Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999)."
Blackmon v. State, 7 So.3d 397, 419 (Ala.Crim.App.2005). See also Ex parte Key, 891 So.2d 384, 390 (Ala.2004) ; Ex parte Clark, 728 So.2d 1126, 1140-41 (Ala.1998).
"[T]he status of the victim is of no consequence in determining whether the crime was unnecessarily torturous to the victim. However, it is relevant and probative of whether the crime was conscienceless or pitiless." Clark v. State, 896 So.2d 584, 648-49 (Ala.Crim.App.2000). See Fleming, Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder was Heinous, Cruel, Depraved, or the Like-Post-Gregg Cases, 63 A.L.R.4th 478 (1988).[15]
To determine whether Katherine's murder was especially heinous, atrocious, or cruel as compared to other capital murders, we must consider the entire chain of events that led to Katherine's death. "[A] murder is not rendered especially heinous, atrocious, or cruel merely by the specific method in which a victim is killed, but by the entire set of circumstances surrounding the killing." State v. Tirado, 358 N.C. 551, 595, 599 S.E.2d 515, 544 (2004). "In evaluating the brutality and heinousness of a defendant's conduct, the entire spectrum of facts surrounding *440 the given incident must be analyzed and evaluated." People v. McGee, 121 Ill.App.3d 1086, 1089, 77 Ill.Dec. 539, 542, 460 N.E.2d 843, 846 (1984).
"This Court has affirmed findings that certain 'execution style' murders were 'especially heinous, atrocious or cruel.' See, Rieber v. State, 663 So.2d 985, 992-93 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.1995) (the victim had been stalked by the defendant before the murder; the victim was very much afraid of the defendant; she was robbed and was shot in the wrist and then in the head; she was alive when she was found, but subsequently died ); Wright v. State, 494 So.2d 726, 744 (Ala.Cr.App.1985), aff'd, 494 So.2d 745 (Ala.1986) (trial court found that the two victims were murdered 'in order that they would not be witnesses' and that they 'were each shot in the head [and] slowly died in a pool of blood'); Lawhorn v. State, 581 So.2d 1159, 1174 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.1991) (victim was run down and was 'confronted with the barrel of a shotgun in his face'; he was shot and shot again after getting back up; he was then shot three times while lying on the ground 'trapped and making gurgling noises' ). In those cases cited here, the victims were aware of what was happening to them."
Ex parte Clark, 728 So.2d 1126, 1139 (Ala.1998) (emphasis in original). See also State v. Rossi, 146 Ariz. 359, 706 P.2d 371 (1985) ("[D]efendant used special bullets which he knew were designed to inflict greater tissue damage on a human body.").
Here, there was testimony that within two hours of her death Katherine and Russell had been involved in a car accident in which the air bags in Russell's vehicle had deployed, that Katherine had suffered a blunt-force injury to her chest that was consistent with an air bag, that Russell had fled the scene of that accident, that the vehicle involved in the accident followed him to his house, that the occupants reported the accident to police, that Russell refused to let anyone in the house after the accident, that Katherine was last seen crying and upset, and that Katherine was shot at point-blank range while in a crouched position between the side of the dryer and a wall.[16] Russell used a large caliber gun, a .40 Glock brand semi-automatic pistol, and pressed it to Katherine's head.[17] The bullet struck Katherine's head with such force that her skull exploded. Russell then placed Katherine's lifeless body in a plastic trash can, head first, and put that can in the backseat of his car. Russell's callous treatment of Katherine's body evidenced his total disrespect for human life.
Certainly, it was reasonable for the jury to conclude that at the time of Katherine's death she was crouched between the dryer and a wall, in a "cubby area," in an attempt to hide from the only other occupant of the house, Russell, and that her fear of him motivated her to hide. This inference was reasonable based on the evidence presented.
"Reasonable inferences from evidence ... may well furnish a basis for proof beyond reasonable doubt." Royals v. State, 36 Ala.App. 11, 15, 56 So.2d 363, 367 (1951). "An inference is merely a permissible deduction from the proven facts which the jury may accept or reject or give such probative value to as it *441 wishes." Browning v. State, 429 So.2d 653, 654 (Ala.Crim.App.1982).
"An inference must be more than speculation and conjecture to be reasonable, however. Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 521 (10th Cir.1987). While '[t]he line between "reasonable inferences" and mere speculation is impossible to define with any precision,' id., ' "[i]f there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts," ' id. (quoting Tose v. First Pa. Bank, N.A., 648 F.2d 879, 895 (3d Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) )."
United States v. Galbraith, 20 F.3d 1054, 1057 (10th Cir.1994).
"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."
Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946). "[An appellate court does] not search for inferences supporting a contrary verdict or re-weigh the evidence because this type of analysis would substitute an appellate court's judgment for that of the jury." State v. Graham, 137 N.M. 197, 203, 109 P.3d 285, 291 (2005). "In determining the sufficiency of the evidence ... a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution." Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984).
In this case, "[u]tilizing their common knowledge and experience as members of the human race, the jurors were capable of evaluating the proof and determining whether the victim suffered severe mental pain." State v. Nesbit, 978 S.W.2d 872, 886-87 (Tenn.1998). The jury determined that, based on the entire set of facts surrounding the murder, Katherine had suffered psychological torture before her death. It is not for this Court to draw any contradictory conclusions from the evidence.
For these reasons, we hold that the jury correctly found and the circuit court applied the aggravating circumstance that Katherine's murder was especially heinous, atrocious, or cruel as compared to other capital murders. For these reasons, Russell is due no relief on this claim.
XVIII.
Last, as required by § 13A-5-53, Ala.Code 1975, this Court must review the propriety of Russell's conviction and sentence of death. Russell was indicted for, and was convicted of, murdering 11-year-old Katherine Helen Gillespie, an offense defined as capital by § 13A-5-40(a)(15), Ala.Code 1975, because Katherine *442 was less than 14 years of age and was eligible for the death penalty because the jury determined that the murder was especially heinous, atrocious, or cruel. See § 13A-5-49(8), Ala.Code 1975. The jury unanimously recommended that Russell be sentenced to death. The circuit court followed the jury's recommendation and sentenced Russell to death.
The record shows that Russell's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The circuit court found as the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital murders, § 13A-5-49(8), Ala.Code 1975. The court found the existence of one statutory mitigating circumstance-that Russell had no significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. The circuit court found the following nonstatutory mitigating circumstances:
"[Russell] offered non-statutory mitigating circumstances through the testimony of Dr. Stanley Brodsky who testified that Russell was of sound mind and lacked a violent pathology. Dr. Brodsky further testified that Russell believed the killing to be an accident and was remorseful for its occurrence."
(C. 157.) The circuit court found that the aggravating circumstance outweighed the mitigating circumstances and sentenced Russell to death.
This Court has independently weighed the aggravating circumstance and the mitigating circumstances as required by § 13A-5-53(b)(2), Ala.Code 1975, and is convinced, as was the circuit court, that death was the appropriate sentence for the senseless murder of 11-year-old Katherine Helen Gillespie.
Neither is Russell's death sentence disproportionate or excessive as compared to the penalties imposed in similar cases. See Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010) ; Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013).
Last, as required by Rule 45A, Ala. R.App. P., this Court has searched the record for any error that may have affected Russell's substantial rights, and we have found none.
For the forgoing reasons, we affirm Russell's capital-murder conviction and his sentence of death.
AFFIRMED.
Kellum and Burke, JJ., concur. Windom, P.J., concurs in the result. Welch, J., dissents, with opinion. Joiner, J., recuses himself.

Katherine's mother was dead, and Russell had been given sole legal guardianship of Katherine by Helen Gillespie-Katherine's grandmother. The record shows that Russell was in the process of adopting Katherine when the murder occurred.

Section 13A-5-55, Ala.Code 1975, states: "In all cases in which a defendant is sentenced to death, the judgment of conviction shall be subject to automatic review. The sentence of death shall be subject to review as provided in Section 13A-5-53, Ala.Code 1975."

This doorway provided an entrance into the garage. There was a separate doorway inside the garage providing an entrance into the lower level, also described as the basement, of the house.

The photographs of the crime scene show that the laundry area is a small hall, that the washer and dryer are on the right side wall, and that there was a 12-inch space from the far wall to the side of the dryer. At trial, this area was referred to as a "cubby area."

"The Alabama Supreme Court has adopted federal case law defining plain error." Ex parte Womack, 435 So.2d 766, 769 (Ala.1983).

Rule 9.3(a), Ala. R.Crim. P., states: "Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the case, concerning any testimony until all witnesses have been released by the court."

Federal Rules of Evidence, Rule 615, is similar to the Alabama Rule but contains the phrase "the court must order witnesses excluded." (Emphasis added.)

This term has been used to describe the process during voir dire where a prospective juror is asked about his or her views on the death penalty.

"For purposes of reviewing a Batson claim, we view the alternate jurors as having been struck." Shaw v. State, 207 So.3d 79, 93 n. 5 (Ala.Crim.App.2014).

Rule 404(b), Ala. R. Evid., provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

This specific argument was not made at trial or in postjudgment proceedings, probably because trial counsel essentially conceded during opening statements that the State would prove that Russell killed Katherine.

Section 12-3-16, Ala.Code 1975, states: "The decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328 (now § 139 et seq., Ala. Const. (Off.Recomp.))."

The State says in its brief that this statement is a quotation from a poem. (State's brief, at p. 63, n. 10.)

This statute addresses the notice requirements for the hearing to determine whether a sentence of death is justified. 18 U.S.C. § 3593(a), reads, in pertinent part: "The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identified the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family."

Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1970).

All of these facts were relevant to Russell's state of mind at the time he took a took a large caliber pistol, placed it against Katherine's head, and pulled the trigger.

There was testimony that, in total, 37 handguns were seized from Russell's residence and from his Cadillac Escalade. (R. 1177.)